MAYER BROWN LLP
JOHN NADOLENCO (SBN 181128)
jnadolenco@mayerbrown.com
BARRETT L. SCHREINER (SBN 266617)
bschreiner@mayerbrown.com
350 South Grand Avenue
25th Floor
Los Angeles, CA  90071-1503
Telephone:  (213) 229-9500
Facsimile:   (213) 625-0248

Attorneys for Defendant
SPOKEO, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT

## WESTERN DIVISION

| | |
|---|---|
| THOMAS ROBINS, individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiff,<br><br>　v.<br><br>SPOKEO, INC.,<br><br>　　　　　　Defendant. | Case No. CV-10-5306-ODW (AGRx)<br><br>**APPENDIX OF RELEVANT AUTHORITIES CITED IN MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SPOKEO, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:　May 16, 2011<br>Time:　1:30 p.m.<br>Judge:　Hon. Otis D. Wright II |

APPENDIX OF RELEVANT AUTHORITIES CITED IN MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SPOKEO, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; CASE NO. CV-10-5306-ODW (AGRx)

700032956

Defendant Spokeo, Inc. ("Spokeo") hereby attaches true and correct copies of the following relevant authorities cited in its Memorandum of Points and Authorities in Support of Spokeo, Inc.'s Motion to Dismiss First Amended Complaint:

1. Kristen J. Mathews & Christopher Wolf, "Financial Privacy Law", in *Proskauer on Privacy* § 2:2.2[C] (2010);

2. Encyclopedia Britannica, Search Engine, http://www.britannica.com/EBchecked/topic/1017484/search-engine (last visited Oct. 4, 2010).

Dated: March 17, 2011

MAYER BROWN LLP
JOHN NADOLENCO
BARRETT L. SCHREINER

By: /s/John Nadolenco
John Nadolenco
Attorneys for Defendant
SPOKEO, INC.

1

APPENDIX OF RELEVANT AUTHORITIES CITED IN MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF SPOKEO, INC.'S MOTION TO DISMISS FIRST AMENDED COMPLAINT; CASE NO. CV-10-5306-ODW (AGRx)

700032956

1.

Westlaw.

PLIREF-PRIV s 2:2.2 Page 1
Proskauer on Privacy s 2:2.2
**(Cite as: PLIREF-PRIV s 2:2.2)**

Practising Law Institute
Proskauer on Privacy

Kristen J. Mathews and Christopher Wolf [FNa1]

Copyright (c) 2010 by the Practising Law Institute

Current through Release 4, July 2010

Chapter 2: Financial Privacy Law
§ 2:2 Fair Credit Reporting Act and the Fair and Accurate Credit Transactions Act

\*2-6 § 2:2.2 Coverage Under the FCRA

Duties and coverage under the FCRA turn on three essential terms contained in the Act. First, the Act is intended to protect individuals, namely anyone who is a "consumer" as defined by the FCRA. [FN17] Second, the FCRA places a great deal of emphasis on protecting the content of what is contained in a consumer's "consumer report." [FN18] Third, with some exceptions, most of the FCRA requirements generally extend only to entities deemed a "consumer reporting agency" by the provisions of the Act. [FN19]

**[A] Definition of "Consumer" Under the FCRA**

At its base, the FCRA is a consumer protection statute, evidenced largely by the fact that the Federal Trade Commission (FTC) is vested with much of the rule-making and enforcement duties under the Act. [FN20] The protections afforded by the FCRA extend only to those falling within the definition of "consumer." Under the Act, a "consumer" is defined succinctly as "an individual." [FN21] Congress's decision to use that definition, rather than defining consumer as "a person," likely reflects its desire at the time to protect individual consumers and not artificial entities such as partnerships or corporations. [FN22] Notably, the FCRA distinguishes between individuals and persons--and thus limits its reach--by defining a "person" as "any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity." [FN23]

> The Act's legislative history further supports this reading of the FCRA, providing that:
> \*2-7 The purpose of the Fair Credit Reporting Bill is to protect consumers from inaccurate or arbitrary information in a consumer report that is used as a factor in determining an individual's eligibility for credit, insurance or employment. It does not apply to reports used for business, commercial or professional purposes. [FN24]

Accordingly, courts have rejected attempts to enlarge the Act's reach, and have held that only individual consumers may seek to invoke the remedial provisions of the FCRA. [FN25] Therefore, it is well established that only individuals have rights under the FCRA, and only those individuals may seek remedies through its provisions.

**[B] Definition of "Consumer Report" Under the FCRA**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-cv-05306-ODW-AGR   Document 48   Filed 03/17/11   Page 5 of 12   Page ID #:539

PLIREF-PRIV s 2:2.2
Proskauer on Privacy s 2:2.2
(Cite as: PLIREF-PRIV s 2:2.2)

Page 2

In addition to limiting coverage to individual consumers, the FCRA provides those individuals with, among other things, access to and protection from inaccuracies contained in their consumer reports. [FN26] Under the Act, a "consumer report" is defined as:

> [A]ny information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to be used or collected in whole or in part for the purpose of serving as a factor in establishing the consumer's eligibility for--
> (A) credit or insurance to be used primarily for personal, family, or household purposes;
> (B) employment purposes; or
> (C) any other purpose authorized under section 1681b of this title. [FN27]
>
> *2-8 "Other purposes" under section 1681b include, for example, insurance underwriting involving the consumer or in relation to a business transaction initiated by the consumer. [FN28]

When faced with the question of whether a given report constitutes a "consumer report" under the Act, courts generally have focused on whether the given person or entity expects the report to be used for a "consumer purpose." [FN29] Interpreting courts have emphasized the Act's provisions regarding proper uses of consumer reports under section 1681 when defining "consumer purposes." As a result, consumer purposes generally include credit transactions, employment purposes, insurance purposes, to determine eligibility for a license, to assess credit risk, or other legitimate business needs. [FN30] Thus, the purpose for which the consumer information was originally collected by a person or entity largely determines whether the FCRA regards a given set of information as a consumer report.

For example, in *Ippolito*, the requesting party, WNS, was a franchising corporation that happened to be involved in a trademark infringement dispute with the plaintiffs. [FN31] WNS requested Equifax Services, Inc. to run a "Special Service Character/Financial Report" on the plaintiffs, which would involve the collection of information about their credit standing, credit capacities, characters, and reputations in the community. [FN32] Equifax testified at trial that users of these types of reports typically were contemplating doing business in some capacity or being associated in a business capacity with the individual who was the subject of the report. [FN33] When WNS ordered the report, however, it did not inform Equifax that the purpose of the report was to evaluate persons associated with its corporate litigation (which the parties later agreed is a non-consumer purpose under the Act). [FN34] Further, the CRA had regularly prepared reports for WNS on prior occasions so that WNS could evaluate prospective franchisees. [FN35] Based on these facts, the Seventh Circuit held that a jury could reasonably infer that the CRA expected the report to be used for evaluating prospective franchisees, which does not fall within the definition of the term "consumer report." [FN36]

Courts have further used the concept of "consumer purpose" to restrict the Act's scope to those consumer reports that are expected to *2-9 be used in connection with the "legitimate business needs" of the consumer. Accordingly, these courts have limited FCRA coverage to reports that are expected to be used for personal credit or personal insurance, employment, or licensing purposes. [FN37]

Other courts have held that the FCRA was not meant to apply to business corporations in obtaining business or commercial credit, because members of the business community usually have the means to respond to false or inaccurate reports concerning their credit and business, and thus are less likely than individuals to need the protections of the Act. [FN38] Further, courts have determined that because the FCRA is designed to protect consumers and their *personal* credit, "[i]t does not apply to reports utilized for business, commercial or professional purposes." [FN39] Even if a business (as opposed to a consumer) transaction involves the use of a consumer's

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-cv-05306-ODW-AGR   Document 48   Filed 03/17/11   Page 6 of 12   Page ID #:540

PLIREF-PRIV s 2:2.2                                                                                   Page 3
Proskauer on Privacy s 2:2.2
(Cite as: PLIREF-PRIV s 2:2.2)

credit information to determine eligibility for a service, FCRA does not apply. [FN40]

Similarly, reports associated with businesses operated by individual consumers do not fall within the purview of the FCRA. [FN41] In instances where a person obtains consumer information about an individual from a credit-reporting agency for purposes of evaluating that individual as a potential business partner, courts have concluded that such a use does not implicate the FCRA. [FN42] In *Podell*, the plaintiff argued that incorrect, unfavorable credit reports issued by two credit reporting agencies had dissuaded the requesting individual from entering a business relationship with the plaintiff. [FN43] The plaintiff then sued the *2-10 credit reporting agencies for negligence under section 1681o of the Act and willful noncompliance under section 1681n of the Act. [FN44] The court held that the loss of a prospective business relationship is not cognizable under the FCRA:

> Plaintiff's hoped-for association with Jaffee in a Florida real estate venture is a quintessential example of a business transaction. Jaffee obtained copies of plaintiff's credit reports in order to evaluate his desirability as a business partner. However, "[i]t is clear from its legislative history that the [FCRA] was intended to apply only to reports which relate to the consumer's eligibility for personal credit or other commercial benefits as a consumer, and not to the consumer's business transactions." [FN45]

The court further noted that "it is generally held that a plaintiff may not recover under the FCRA for losses resulting from the use of a credit report solely for a commercial transaction." [FN46]

## [C] Definition of "Consumer Reporting Agency" Under the FCRA

Related to the rights bestowed upon consumers under the FCRA, with some exceptions, the Act generally imposes most of its obligations only on those persons and entities who receive and/or prepare sets of consumer information, or those who constitute what the Act defines as a "consumer reporting agency." [FN47] The Act provides a somewhat circular meaning for "consumer reporting agency," defining it as "any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports." [FN48] Despite this circular definition, the FCRA's scope remains relatively clear. Namely, the Act's emphasis on regulating consumer reports and consumer reporting agencies (CRAs), that is, those persons or entities having the greatest access to and control over consumer credit information, reflects Congress's stated purpose of ensuring "accuracy and fairness" in the credit reporting system. [FN49]

*2-11 Significantly, the FCRA's above definition of a CRA does not serve to merely regulate the three major credit reporting agencies in the United States. The well-known entities Equifax, Experian, and Trans Union are regulated as CRAs under the Act. However, those entities fall under the general definition of CRA *and* under the narrower definition of "consumer reporting agency that compiles and maintains files on consumers on a nationwide basis." [FN50] Thus, this additional provision serves to bring a number of other persons or entities within the scope of the FCRA's general definition of a CRA, although with somewhat less substantial obligations.

On its face, the general definition of a CRA appears to apply to any person or entity that regularly assembles, collects, or evaluates consumer credit information and then reports that information to a third party. [FN51] However, those persons or entities are not required to comply with the FCRA in every instance. Given that the definition of a CRA depends largely on the definition of "consumer report," the fact that a particular set of information is not a consumer report can prevent a person or entity from acting as a CRA for the purposes of the

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-cv-05306-ODW-AGR   Document 48   Filed 03/17/11   Page 7 of 12   Page ID #:541

PLIREF-PRIV s 2:2.2
Proskauer on Privacy s 2:2.2
**(Cite as: PLIREF-PRIV s 2:2.2)**

Page 4

Act. For example, a person or entity may meet part of the definitional requirements of a CRA in that it "regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers." However, if that person or entity does not provide "consumer reports" to clients under the limited meaning of the Act, the person or entity is not a CRA that "furnish[es] consumer reports to third parties" within the scope of the FCRA. [FN52]

Further, in light of the Act's limited application to consumers and consumer reports, courts have found that a person or entity who collects credit information about businesses and individuals engaged *in business in their business capacities*, not as consumers, is not a CRA and thus cannot violate the Act. [FN53] However, assuming that all of the definitional elements are satisfied under the FCRA, persons or entities deemed CRAs that provide consumer reports to third parties are required to comply with the Act's provisions described below.

[FNa1]. The authors thank Brendon Tavelli, Tim Tobin, David Rappaport, and David McTaggart for their assistance in the preparation of this chapter.

[FN17]. *See* 15 U.S.C. § 1681a(c).

[FN18]. *See* 15 U.S.C. § 1681a(d).

[FN19]. *See* 15 U.S.C. § 1681a(f). Note, however, that some requirements apply to users and resellers of consumer reports. *See infra* §§ 2:2.8 and 2:2.9.

[FN20]. *See* 15 U.S.C. § 1681s(a).

[FN21]. 15 U.S.C. § 1681a(c).

[FN22]. *See* 16 C.F.R. pt. 600, app. at 495-96 (2006).

[FN23]. 15 U.S.C. § 1681a(b).

[FN24]. 116 Cong. Rec. 36,572 (1970).

[FN25]. *See* Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bureau of Maricopa County, Inc., 637 P.2d 733, 739 (Ariz. 1981) (citing Krumholz v. TRW, Inc., 360 A.2d 413 (N.J. Super. Ct. 1976)).

[FN26]. *See* 15 U.S.C. §§ 1681g, 1681i.

   [FN27]. 15 U.S.C. § 1681a(d)(1)(A)-(C). FCRA also expressly excludes certain things from the definition of "consumer report." The term does not include:any (i) report containing information solely as to transac-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-cv-05306-ODW-AGR  Document 48  Filed 03/17/11  Page 8 of 12  Page ID #:542

PLIREF-PRIV s 2:2.2  Page 5
Proskauer on Privacy s 2:2.2
(Cite as: PLIREF-PRIV s 2:2.2)

tions or experiences between the consumer and the person making the report; (ii) communication of that information among persons related by common ownership or affiliated by corporate control; or (iii) any communication of other information among persons related by common ownership or affiliated by corporate control [if there is clear disclosure to the consumer and the consumer is given the opportunity to opt out before disclosure].15 U.S.C. § 1681a(d)(2)(A). Other exceptions also apply. *Id.* § 1681a(d)(2)(B)-(D).

[FN28]. *See* 15 U.S.C. § 1681b(a).

[FN29]. *See, e.g.,* Ippolito v. WNS, Inc., 864 F.2d 440, 450 (7th Cir. 1988).

[FN30]. *See id.*; 15 U.S.C. § 1681b(a)(3).

[FN31]. *See Ippolito*, 864 F.2d at 443, 444.

[FN32]. *Id.* at 443.

[FN33]. *Id.* at 443-44.

[FN34]. *Id.* at 450.

[FN35]. *Id.* at 451.

[FN36]. *Id.*

[FN37]. *See, e.g.,* McCready v. eBay, Inc., 453 F.3d 882, 889 (7th Cir. 2006) (holding eBay's "Feedback Forum"--which rates eBay buyers and sellers--is not a consumer report because it "is used to inform eBay users' decision to buy from, or sell to, a particular user, an inherently commercial activity"); Pappas v. City of Calumet City, 9 F. Supp. 2d 943, 947 (N.D. Ill. 1998) (citing Ippolito v. WNS, Inc., 864 F.2d 440, 451 (7th Cir. 1988)).

[FN38]. *See* Antwerp Diamond Exch. of Am., Inc. v. Better Bus. Bureau of Maricopa County, Inc., 637 P.2d 733 (Ariz. 1981) (citing Krumholz v. TRW, Inc., 360 A.2d 413 (N.J. Super. Ct. 1976).

[FN39]. *Ippolito*, 864 F.2d at 452.

[FN40]. *See* Yeager v. TRW, Inc., 961 F. Supp. 161, 162 (E.D. Tex. 1997); Zeller v. Samia, 758 F. Supp. 775, 780 (D. Mass. 1991) (reports issued for commercial, business, or professional purposes are outside scope of the Act, which is designed to protect consumers only in their individual capacity); *see also* Cook v. Equifax Info. Sys., Inc., 1992 WL 356119, at *3 (D. Md. Nov. 20, 1992) (FCRA not applicable where credit reports were used

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-cv-05306-ODW-AGR   Document 48   Filed 03/17/11   Page 9 of 12   Page ID #:543

PLIREF-PRIV s 2:2.2                                                                                           Page 6
Proskauer on Privacy s 2:2.2
**(Cite as: PLIREF-PRIV s 2:2.2)**

for extension of corporate line of credit, corporate credit cards, and favorable lease for corporate vehicle).

[FN41]. *See* Fernandez v. Retail Credit Co., 349 F. Supp. 652 (E.D. La. 1972) (report on consumer for credit or insurance in connection with business operated by consumer is not a consumer report; thus, FCRA does not apply to it).

[FN42]. *See* Podell v. Citicorp Diners Club, Inc., 914 F. Supp. 1025 (S.D.N.Y. 1996), *aff'd on other grounds*, 112 F.3d 98 (2d Cir. 1997).

[FN43]. *Id.* at 1036.

[FN44]. *Id.* at 1030.

[FN45]. *Id.* (*quoting* Boothe v. TRW Credit Data, 523 F. Supp. 631, 633 (S.D.N.Y. 1981)).

[FN46]. *Id.*

[FN47]. *See* 15 U.S.C. § 1681a(f).

[FN48]. *Id.*

[FN49]. *See* 15 U.S.C. § 1681.

[FN50]. The Act defines such agencies as "a consumer reporting agency that regularly engages in the practice of assembling or evaluating, and maintaining, for the purpose of furnishing consumer reports to third parties bearing on a consumer's credit worthiness, credit capacity, each of the following regarding consumers residing nationwide: 1) [p]ublic record information[,] 2) [c]redit account information from persons who furnish that information regularly and in the ordinary course of business."

[FN51]. *See* 15 U.S.C. § 1681a(f).

[FN52]. *See* 15 U.S.C. § 1681a(f).

[FN53]. *See, e.g.*, Mende v. Dun & Bradstreet, Inc., 670 F.2d 129, 133-34 (9th Cir. 1982) (examining the federal FCRA for guidance in interpreting the California Consumer Credit Reporting Agencies Act).

PLIREF-PRIV s 2:2.2

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 2:10-cv-05306-ODW-AGR Document 48 Filed 03/17/11 Page 10 of 12 Page ID #:544

PLIREF-PRIV s 2:2.2
Proskauer on Privacy s 2:2.2
(Cite as: PLIREF-PRIV s 2:2.2)

Page 7

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2.

Case 2:10-cv-05306-ODW-AGR   Document 48   Filed 03/17/11   Page 11 of 12   Page ID #:545

ARTICLE *from the* Encyclopædia Britannica

**search engine,** computer program to find answers to queries in a collection of information, which might be a library catalog or a database but is most commonly the World Wide Web. A Web search engine produces a list of "pages"—computer files listed on the Web—that contain the terms in a query. Most search engines allow the user to join terms with *and*, *or*, and *not* to refine queries. They may also search specifically for images, videos, or news articles or for names of Web sites.

The Web is largely unorganized, and the information on its pages is of greatly varying quality, including commercial information, national databases, research reference collections, and collections of personal material. Search engines try to identify reliable pages by weighting, or ranking, them according to the number of other pages that refer to them, by identifying "authorities" to which many pages refer, and by identifying "hubs" that refer to many pages. These techniques can work well, but the user must still exercise skill in choosing appropriate combinations of search terms. A search for *bank* might return hundreds of millions of pages ("hits"), many from commercial banks. A search for *river bank* might still return over 10 million pages, many of which are from banking institutions with *river* in the name. Only further refinements such as *river bank and riparian* reduce the number of hits to hundreds of thousands of pages, the most prominent of which concern rivers and their banks.

Search engines use crawlers, programs that explore the Web by following hypertext links from page to page, recording everything on a page (known as caching), or parts of a page, together with some proprietary method of labeling content in order to build weighted indexes. Web sites often include their own labels on pages, which typically are seen only by crawlers, in order to improve the match between searches and their sites. Abuses of this voluntary labeling can distort search results if not taken into account when designing a search engine. Similarly, a user should be cognizant of whether a particular search engine auctions keywords, especially if sites that have paid for preferential placement are not indicated separately. Even the most extensive general search engines, such as Google, Yahoo!, Baidu, and Bing, cannot keep up with the proliferation of Web pages, and each leaves large portions uncovered.